

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-16-00100-CV
_____

IN THE INTEREST OF H.B. AND R.F., CHILDREN

On Appeal from the County Court at Law No 2
Potter County, Texas
Trial Court No. 75,950-2, Honorable Pamela Cook Sirmon, Presiding

June 22, 2016

## MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

I.B., the biological mother of H.B. (17 at time of trial) and R.F. (5 at time of trial), appeals from a final order terminating her parental rights to those children.[1] Her sole issue on appeal involves the legal and factual sufficiency of the evidence underlying the decision to terminate. She does not contest the four statutory grounds found by the trial court as warranting termination. Instead, she attacks the finding that termination is in the best interests of the children. We affirm.

The pertinent standard of review is that most recently discussed in *In re A.B.*, 437 S.W.3d 498 (Tex. 2014). It requires us to peruse the entire record to determine if the

_____

[1] The case originally involved two additional children. However, N.B. aged out of the case prior to trial and G.P.'s father had been appointed her permanent managing conservator and was not part of this trial.

evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the allegations being levied. *Id.* at 502-503. In making that determination, we must remember to afford the factfinder due deference since it is the sole arbiter on matters of witness credibility and demeanor. *Id.* at 503.

Next, in reviewing whether it is in the best interest of the child to terminate the parental relationship, we may consider a myriad of factors. They include 1) the desires of the child; 2) the present and future physical and emotional needs of the child; 3) the present and future emotional and physical danger to the child; 4) the parental abilities of the persons seeking custody; 5) the programs available to assist those persons seeking custody in promoting the best interest of the child; 6) the plans for the child by the individuals or agency seeking custody; 7) the stability of the home or proposed placement; 8) acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and 9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *In re D.S.*, 333 S.W.3d 379, 383-84 (Tex. App.—Amarillo 2011, no pet.). Additionally, the evidence supporting the statutory grounds for termination may also be used to support the finding that the child's best interests favor termination. *In re D.S.* 333 S.W.3d at 384. Finally, we cannot forget that past actions often indicate future conduct. That is, a "trier of fact may measure a parent's future conduct by his or her past conduct . . . ." *Id.* And, if a fact finder opts to so measure the parent's conduct, we must defer to that factually based inference.

Here, the trial court found four statutory grounds warranting termination. Two involved endangering the physical or emotional well-being of the child, one involved constructive abandonment of a child, and one involved being convicted of or being

2

placed on deferred adjudication for being responsible for the death or serious bodily injury to a child. As previously mentioned, I.B. did not question any of those findings on appeal. Nor did she deny her history of drug and alcohol abuse that started in her teenage years and persisted after having four children. The drugs included methamphetamines, cocaine, ecstasy, oxycontin, and hashish.[2] Though she asserted that she had stopped taking drugs by 2012, she nonetheless opted to forego drug testing at different times after that date and the removal of her children. She also admitted that drug abuse could endanger her children.

Instances of violent behavior in which I.B. engaged were her being convicted of striking an elderly lady, striking one of her daughter's in the face, striking her other children, and her arrest and conviction for spitting at and kicking a law enforcement officer. Evidence further revealed that she once contemplated throwing R.F. off the balcony. Indeed, violence in the household (undertaken by both parent and children) was so common place that one witness testified that the youngest children believed it to be the norm in households. Abuse, though, was not simply limited to the physical. I.B. also engaged in the emotional and psychological abuse of her children. One instance involved accusing H.B. of causing the family to be broken apart.[3] Because H.B. suffered from depression and felt responsible for the well-being of her mother and younger siblings, the comment led H.B. to attempt suicide.

---

[2] Evidence revealed that H.B. would take one or more of her children with her to buy alcohol during the midnight hours. They also happened to be with her when she once shoplifted. Others reported she would have her fifteen year old daughter drive her to bars.

[3] H.B. reported that she attempted to commit suicide because she had visited with her mother who told her that the family would never get back together, it was H.B.'s fault, showed H.B. paperwork from the Department and had H.B. read the paperwork. That "devastated" H.B. and caused her to feel "horrifically guilty that her family was in the state that it was in . . . ." So, H.B. took pills to kill herself.

3

Suffering from mental conditions such as schizophrenia, anxiety, and depression, I.B. was twice admitted to a mental health facility. Apparently, though, she began taking medication to treat one or more of those conditions by the time of trial.

When asked at trial whether she could care for H.B. and R.F., their mother responded that she could not. This was so because she had no job and lived in a homeless shelter. Prior houses in which she and the children lived were found to be dirty and bug infested. Moreover, two of the three men with whom she had children and lived had criminal records and/or abused illegal substances as well.

In their current homes, H.B. and R.F. have adjusted well. The former lives with her half-sister and the half-sister's father, does well in school, participates in extracurricular activities, and is employed. Since moving into that abode, she no longer engages in drug abuse, fights, or sexual activity. Those were traits of hers when living with I.B. She also wishes to attend college and mentioned a desire to be adopted by her half-sister's father. While expressing the desire to have contact with her mother, H.B. wanted to remain living with her half-sister and the latter's father (whom she called "dad").

R.F. too has bonded with his current caregivers. He has begun to read and is doing well in school. His prior aggressiveness, emotional behavior and night terrors have diminished since being placed with his foster parent. So too has he begun participating in sports and developed ties with the relatives of his foster parent. The latter also voiced the desire to adopt him.

According to one witness, the emotional and physical needs of the children were not being met by I.B. They are being met in their current placement, though. The same

witness opined that the children were free from emotional and physical danger but would not be if placed with I.B.

Upon perusing the record, we conclude that it contains ample evidence upon which a factfinder could reasonably form a firm belief or conviction that termination of I.B.'s parental rights to H.B. and R.F. was in the best interests of H.B. and R.F. Accordingly, we overrule the issue and affirm the judgment.

Brian Quinn
Chief Justice
